23-50582

# In the United States Court of Appeals for the Fifth Circuit

---

ROLANDO AMBRIZ,

*Plaintiff-Appellant,*

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES,

*Defendant-Appellee.*

---

**On Appeal From The United States District Court
For The Western District of Texas, Austin
Civil Action No. 1:22-cv-01067-RP**

---

**APPELLANT'S PRINCIPAL BRIEF**

---

ROGER L. MANDEL
JEEVES LAW GROUP, P.C.
Suite 135
2833 Crockett Street
Fort Worth, TX 76107
214-253-8300
rmandel@jeevesmandellawgroup.com
*Counsel for Plaintiff-Appellant*

No. 23-50582

# IN THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT

ROLANDO AMBRIZ,

*Plaintiff – Appellant*,

v.

GLEN HEGAR, Comptroller of Public Accounts of the State of Texas, in his official and individual capacities,

*Defendant – Appellee.*

On Appeal from the
United States District Court for the Western District of Texas
Civil Action No. 1:22-cv-01067-RP

## PLAINTIFF-APPELLANT'S CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.  Angela Colmenero, attorney representing Appellee.

2.  Arthur Susman, attorney representing Appellant.

3.  Brent Webster, attorney representing Appellee.

4.  Christopher D. Hilton, attorney representing Appellee.

i

5.    Craig E. Rothburd, attorney representing Appellant.

6.    Craig E. Rothburd, P.A., Law Firm Representing Appellant.

7.    Glen Hegar, Comptroller of Public Accounts of the State of Texas, in his official and individual capacities, Defendant – Appellee.

8.    Felipe B. Link, attorney representing Appellant.

9.    Grant Dorfman, attorney representing Appellant.

10.    Honorable Robert Pitman, U.S.D.C. Judge.

11.    Honorable Mark Lane, U.S.D.C. Magistrate Judge

12.    James Lloyd, attorney representing Appellee.

13.    Jeeves Law Group, P.A., law firm representing Appellant.

14.    Jeeves Mandel Law Group, P.C., law firm representing Appellant.

15.    Julie M. O'Dell, attorney representing Appellant.

16.    Ken Paxton, attorney representing Appellee.

17.    Kyle D. Highful, attorney representing Appellee.

18.    Kimberly Gdula, attorney representing Appellee.

19.    Link & Associates, law firm representing Appellant.

20.    Rolando Ambriz, Plaintiff/Appellant.

21.    Roger L. Mandel, attorney representing Appellant.

22.    Ryan Kerchur, attorney representing Appellee.

23.    Scott R. Jeeves, Attorney representing Appellant.

24.    Shawn Cowles, attorney representing Appellee.

25.    Smith, Katznstein & Jenkins, law firm representing Appellant.

26.    Taylor Gifford, attorney representing Appellee.

27.    The Law Office of Arthur Susman, law firm representing Appellant.

*/s/Roger L. Mandel*
ROGER L. MANDEL
JEEVES LAW GROUP, P.C.
Suite 135
2833 Crockett Street
Fort Worth, TX 76107
214-253-8300
rmandel@jeevesmandellawgroup.com
*Counsel for Plaintiff-Appellant*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff/Appellant Rolando Ambriz ("Ambriz") requests the Court hold oral argument on his appeal because it presents complex and important issues of first impression to this Court regarding the constitutionality under the Takings Clause of the Fifth Amendment of the Texas Unclaimed Property Act that denies just compensation to the owners of "unclaimed" property for the State's public use of that property.

# **TABLE OF CONTENTS**

PLAINTIFF-APPELLANT'S CERTIFICATE OF INTERESTED PERSONS........i

STATEMENT REGARDING ORAL ARGUMENT ..............................................iv

TABLE OF CONTENTS................................................................................v

TABLE OF AUTHORITIES .......................................................................vii

INTRODUCTION .......................................................................................1

STATEMENT OF JURISDICTION.................................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................3

STATEMENT OF THE CASE........................................................................5

    I.     TEXAS LAW ADDRESSING UNCLAIMED PROPERTY .................5

    II.    FACTS ................................................................................6

    III.   PROCEDURAL HISTORY ........................................................7

SUMMARY OF THE ARGUMENT ...........................................................100

STANDARD OF REVIEW ........................................................................144

ARGUMENT ..........................................................................................15

    I.     AMBRIZ HAS ARTICLE III STANDING TO BRING HIS CLAIMS ...........................................................................155

        A.  Ambriz Suffered an Injury-in-Fact and His Claim is Ripe..............16

        B.  Ambriz's Injury is Fairly Traceable to the Comptroller's Wrongful Conduct ..........................................................21

        C.  The Declaratory and Injunctive Relief Ambriz Seeks Will Redress His Injury..........................................................23

    II.    THE ELEVENTH AMENDMENT DOES NOT BAR AMBRIZ'S CLAIM UNDER THE FIFTH AMENDMENT FOR PROSPECTIVE DECLARATORY AND INJUNCTIVE RELIEF ......24

    III.   THE COMPLAINT STATES AN ACTIONABLE CLAIM UNDER THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT, AS APPLIED TO THE STATES BY THE FOURTEENTH AMENDMENT ....................................................................33

        A.  The Contours of a Takings Claim...................................33

B.  The TUPA Affects a Taking Requiring Just Compensation by Mandating Public Use of Unclaimed Property in the State's Custody ........................................................................................35

    1.  The Magistrate Incorrectly Regarded His "No Taking" Finding as Required by this Court's Decision in *In re Lease Oil Antitrust Litig.*     35

    2.  As the Better Reasoned Decisions Demonstrate, *Clark* Was Wrongly Decided, and the TUPA Affects a Taking Under the Fifth Amendment     377

C.  Ambriz Suffered a Compensable Loss, Which the Comptroller Effectively Conceded Below ...........................................................51

CONCLUSION........................................................................................52

CERTIFICATE OF SERVICE ...........................................................544

CERTIFICATE OF COMPLIANCE ..................................................544

ADDENDUM OF STATUTES ...........................................................525

COPY OF UNPUBLISHED OPINION CITED IN BRIEF ..................52

# <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps;">Cases</span>

*Air Evac EMS, Inc. v. Texas Dept. of Ins., Div. of Workers' Comp.*,
   851 F.3d 507 (5th Cir. 2017)...............................................................16

*Albert v. Franchot*,
   2023 WL 4058986 (D. Md. June 16, 2023)....................................19, 20, 21, 29

*Ark. Game & Fish Comm'n v. U.S.*,
   568 U.S. 23 (2012).......................................................................34

*Ass'n of Cnty. Organizations for Reform v. Fowler*,
   178 F.3d 350 (5th Cir. 1999)........................................................22, 23

*Bay Point Properties, Inc. v. Miss. Transp. Commission*,
   937 F.3d 454 (5th Cir. 2019)........................................................32, 33

*Brown v. Legal Foundation of Wash.*,
   538 U.S. 216, 237 (2003)............................................................50, 51

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021)........................................................1, 2, 34, 35

*Cerajeski v. Zoeller*,
   735 F.3d 577 (7th Cir. 2013)...........................................19, 22, 28, 40-42, 45

*Clapper v. Amnesty Int'l. USA*,
   586 U.S. 398 (2013)....................................................................15

*Clark v. Strayhorn*,
   184 S.W.3d 906 (Tex. App.—Austin 2006, pet. denied),
   *cert. denied*, 127 S. Ct. 508 (2006) ...............................13, 14, 35-39, 42, 43, 44

*Cole-Kelly v. Yee*,
   2023 WL 2480749 (N.D. Cal. Mar. 13, 2023).................................................30

*Dani v. Miller*,
   374 P.3d 779 (Okla. 2016).............................................................44

*Edelman v. Jordan*,
   415 U.S. 651 (1974).......................................................12, 24-28, 30

*Ex parte Young*,
   209 U.S. 123 (1908).................................................4, 7, 8, 12, 16, 24-30, 33

*Goldberg v. Frerichs*,
   912 F.3d 1009 (7th Cir. 2019).........................................................42

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) .........................................................................33

*Hooks v. Kennedy*,
    961 So.2d 425 (La. Ct. App. 2007) ...............................................44

*Horne v. Dept. of Agric.*,
    576 U.S. 350 (2015) ...................................................................34, 46

*In re Lease Oil Antitrust Litig.*,
    570 F.3d 244 (5th Cir. 2009) .................................................... 35-37

*Jacobs v. U.S.*,
    290 U.S. 13 (1933) .....................................................................32, 52

*Knick v. Township of Scott*,
    139 S. Ct. 2162 (2019) ............................................ 16-18, 20, 34, 50

*Kolton v. Frerichs*,
    869 F.3d 532 (7th Cir. 2017) .................................................19, 27, 42

*Lone Star Gas Co. v. Murchison*,
    353 S.W.2d 870 (Tex. Civ. App.—Dallas 1962, writ ref'd n.r.e.) ..................48

*Maron v. Patronis*,
    Case No. 4:22cv255-RH-MAF (N.D. Fla. Sept. 5, 2023) ..............20, 23, 30, 44

*Matinez v. Texas Dept. of Criminal Justice*,
    300 F.3d. 567 (5th Cir. 2002) ........................................................15

*Monsanto Co. v. Geertson Seed Farms*,
    130 S. Ct. 2743 (2010) ...................................................................15

*Morris v. Chiang*,
    163 Cal. App. 4th 753 (Cal. App. 2008) .........................................49

*Murr v. Wisconsin*,
    582 U. S. ——, 137 S.Ct. 1933, 198 L.Ed.2d 497 (2017) .............................1, 34

*Pakdel v. City & County of San Francisco, Ca.*,
    141 S. Ct. 2226 (2021) ...................................................................18

*PennEast Pipeline Co., L.L.C. v. N.J.*,
    141 S. Ct. 2244 (2021) .............................................................. 31-32

*Phillips v. Wash. Legal Found.*,
    524 U.S. 156 (1998) .......................................................................41

*Rideau v. Keller Ind. School Dist.*,
    819 F.3d 155 (5th Cir. 2016) .........................................................15

*Rowlette v. State*,
    656 S.E.2d 619 (N.C. Ct. App. 2008) ............................................................... 44

*Sharpe v. Turley*,
    191 S.W.3d 362 (Tex. App.—Dallas 2006, no pet.) ....................................... 48

*Siebers v. Barca*,
    2022 WL 2438605 (W.D. Wis. Jul. 5, 2022) ................................................... 28

*Simon v. Weissmann*,
    301 Fed. App'x. 107 (3d Cir. 2008) ................................................................. 44

*Smolow v. Hafer*,
    959 A.2d 298 (Pa. 2008) ................................................................................... 44

*Sogg v. Zurz*,
    905 N.E.2d 187 (Ohio 2009) ............................................................................ 43

*Suever v. Connell*,
    579 F.3d 1047 (9th Cir. 2009) .......................................................................... 27

*Support Working Animals, Inc. v. DeSantis*,
    457 F. Supp. 3d 1193 (N.D. Fla. 2020) ........................................................... 24

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002) .......................................................................................... 33

*Texaco, Inc. v. Short*,
    454 U.S. 516 (1982) ................................................ 13, 35, 38-40, 43, 44, 47-49

*Turnacliff v. Westly*,
    546 F.3d 1113 (9th Cir. 2008) .................................................................... 30, 49

*Tyler v. Hennepin County, Minn.*,
    2023 WL 3632754 (U.S. May 25, 2023) ................................. 17, 39, 46, 48, 49

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
    449 U.S. 155 (1980) ........................................................ 32, 34, 37, 38, 41, 49

*Weyhaeuser C. v. Burlington Ins. Co.*,
    74 F.4th 275 (5th Cir. 2023) ....................................................................... 14,15

CONSTITUTIONAL PROVISIONS

U.S. Const., Amend. V................................................... 1, 3, 4, 7, 9-14, 16, 24, 25,
............................................................29-33, 35, 38, 41, 43, 46, 51-53

U.S. Const., Amend. XI .......................................4, 7-9, 13, 15, 24, 26, 30, 31, 52

U.S. Const., Amend. XIV ................................................ 1, 2, 7, 32, 33, 45, 53

Tex. Const., Art. 1 § 17 .................................................................7, 8

STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 1291 ...............................................................................2

28 U.S.C. § 1331 ...............................................................................2

28 U.S.C. § 1343 ...............................................................................2

28 U.S.C. § 1367(a) ...........................................................................2

42 U.S.C. § 1983 ...................................................................2, 30, 33

Cal. Code of Civ. P. § 1300(d)........................................................49

Fed. R. Civ. P. 12(b)(1)...............................................................7,15

Fed. R. Civ. P. 12(b)(6)..............................................................7, 9,14

Fed. R. Civ. P. 58 ...........................................................................10

Illinois Disposition of Unclaimed Property Act ...............................27, 42

Tex. Prop. Code § 71.001, *et seq.* ...................................................6

Tex. Prop. Code §§ 72.001-74.710 ...................................................5

Tex. Prop. Code, Subchapter B, §§ 72.101-72.104 ..................................5

Tex. Prop. Code, Subchapter C, §§ 73.101-102 .................................5

Tex. Prop. Code Ann. § 72.101(a) ...................................................45

Tex. Prop. Code Ann. § 73.101(c) ...................................................45

Tex. Prop. Code Ann. § 73.102 ......................................................45

Tex. Prop. Code § 74.301 ...........................................................5, 55

Tex. Prop. Code § 73.304(a).............................................................5

Tex. Prop. Code § 74.304(d)....................................... 1, 2, 6, 18, 25, 52, 56

Tex. Prop. Code § 74.501 ...........................................................5, 7

Tex. Prop. Code § 74.501(b)...........................................1, 2, 6, 25, 52,56

Tex. Prop. Code Ann. § 74.601(b) & (d) ............................................. 6, 56

Tex. Prop. Code § 74.709 ................................................................... 36

Texas Unclaimed Property Act ...... 4-8, 13, 14, 35, 36, 38, 40, 42, 43, 45, 47, 49, 50

Wisconsin Unclaimed Property Act ........................................................ 28

OTHER AUTHORITIES

J. Orth, *Interest Follows Principal: Why North Carolina Should Pay Interest on Unclaimed Personal Property*, 37 Campbell L. Rev. 321, 331 (Spring 2015) .................................................................................................. 22

# **INTRODUCTION**

The Supreme Court very recently reemphasized the fundamental and essential role property rights play in our country and the critical importance of the Fifth Amendment in securing those rights from governmental appropriation:

> The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom. As John Adams tersely put it, "[p]roperty must be secured, or liberty cannot exist." Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851). This Court agrees, having noted that protection of property rights is 'necessary to preserve freedom' and 'empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them.' *Murr v. Wisconsin*, 582 U. S. ——, ——, 137 S.Ct. 1933, 1943, 198 L.Ed.2d 497 (2017).

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (Roberts, C.J.).

The Supreme Court has accordingly set forth strict rules regarding the application of the Takings Clause. *See Cedar Point Nursery*, 114 S. Ct. at 2071-74. These rules will almost invariably render unconstitutional statutes which purport to allow the government to take custody of private property and make public use of it without paying just compensation. Here, just one of those rules mandates the conclusion that Tex. Prop. Code §§ 74.304(d) and 74.501(b), which prohibit the Comptroller from paying just compensation for the State of Texas' public use of "unclaimed" private property, violate the Takings Clause of the Fifth Amendment.

That one dispositive rule is, "[w]hen the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation…. The government commits a physical taking … when the government physically takes possession of property *without acquiring title to it*." *Cedar Point Nursery*, 141 S. Ct. at 2071 (emphasis added). Under the Texas Unclaimed Property Act, as the Comptroller admits, the State takes physical possession of its citizens' property, but it does not even purport to take title to it. Since the Comptroller admits that the State makes public use of that property by investing it and using the income to pay State obligations, the State commits a taking requiring payment of just compensation.

But the Comptroller cannot pay just compensation to the property owners because Tex. Prop. Code §§ 74.304(d) and 74.501(b) prohibit him from doing so. Accordingly, this Court should declare them unconstitutional and declare that the Comptroller must pay Ambriz just compensation when he claims his property.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367(a) because Ambriz's claims arise under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the Final Judgment entered July 28, 2023, (ROA.276) disposed of all parties' claims

in the case, making it a final decision by the district court. Ambriz timely filed his limited Notice of Appeal on August 9, 2023 (ROA.277), within 14 days of the entry of the Final Judgment.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      The Supreme Court held that a Takings Claim under the Fifth Amendment arises immediately upon the government's taking possession of private property and using it for public purposes, as does the injury to the property's owner. The Court rejected any requirement that the property owner first make a claim for return of the property (exhaust administrative remedies) before filing a federal suit so long as it is clear the government will not pay just compensation for the public use of the property. Defendant-Appellee Glen Hegar, in his official capacity as Texas Comptroller of Public Accounts, took Ambriz's property into custody and the State made public use of it. Texas law prohibits the Comptroller from paying just compensation for same to Ambriz. Ambriz seeks declaratory and injunctive relief that will require the Comptroller to pay him just compensation when he claims his property. Given this, does Ambriz satisfy the Article III standing requirements to bring his claim: injury-in-fact and ripeness, traceability, and redressability?

2.      Ambriz seeks only prospective declaratory and injunctive relief requiring the Comptroller to comply with the Fifth Amendment and pay him just compensation for the State's public use of his property when he makes a claim for

its return. Under *Ex parte Young*, the Eleventh Amendment does not bar a suit in federal court against a state officer in the officer's official capacity that seeks only prospective declaratory and injunctive relief requiring the officer to comply with the Constitution in the future. Does the *Ex parte Young* exception apply to Ambriz's claim such that the Eleventh Amendment does not bar him from bringing that claim in federal court?

3.     The Comptroller took Ambriz's property into custody for the State, the State made public use of it, and the Comptroller will refuse to pay him just compensation for same pursuant to the Texas Unclaimed Property Act ("TUPA"). Despite terming the property "presumed abandoned," the TUPA did not purport to divest Ambriz of title to his property on the grounds that it had been abandoned. Rather, Ambriz has retained ownership of the property, and the State will hold it for his benefit indefinitely while making public use of it. The Takings Clause of the Fifth Amendment provides: "... nor shall private property be taken for public use without just compensation." U.S. Const., Amend. V. Does Ambriz sufficiently plead that TUPA violates the Fifth Amendment's Takings Clause by prohibiting the Comptroller from paying him just compensation for the State's public use of his property?

## STATEMENT OF THE CASE

## I.    TEXAS LAW ADDRESSING UNCLAIMED PROPERTY

Title Six of the Texas Property Code addresses unclaimed property. Tex. Prop. Code, Title Six, Ch. 71-77. Chapters 72, 73 and 74, at issue in this case, constitute the Texas Unclaimed Property Act ("TUPA"). Tex. Prop. Code §§ 72.001-74.710. It requires the delivery of unclaimed property held by third parties (termed "presumed abandoned") to the Comptroller without any administrative or judicial proceeding to determine its status, typically after only three years. Tex. Prop. Code, Subchapter B, §§ 72.101-72.104, and Subchapter C, §§ 73.101-102 (defining personal property that is "presumed abandoned") and § 74.301 (requiring delivery of such property to the Comptroller without any administrative or judicial proceeding); Defendant's Motion to Dismiss (Doc. 21) ("Motion") at 2-3 (ROA.90-91).

The State holds the unclaimed property in perpetuity for its rightful owners. *See* Tex. Prop. Code § 73.304(a) (after delivery of unclaimed property, "the state shall assume custody of the property and responsibility for its safekeeping") and § 74.501 (not putting any time limit on making a claim with the Comptroller for return of unclaimed property); Motion at 2 (ROA.90). It never holds any proceeding to determine that the property has been abandoned and to take title to it (to escheat it); rather, the rightful owner always retains title to it. *See generally* TUPA and *id.*

In contrast, Chapter 71 provides an absolute escheat process by which title to real and personal property of an individual who dies intestate and without heirs can be transferred to the State via a judicial proceeding. Tex. Prop. Code. § 71.001, *et seq.*

Once in State custody, the Comptroller deposits the unclaimed property in the general revenue fund, invests it, and deposits the resulting income there as well. Tex. Prop. Code Ann. § 74.601(b) & (d); Motion at 3 (ROA.91). Tex. Prop. Code §§ 74.304(d) and 74.501(b) prohibit the Comptroller from paying a property owner more than the property he received, including prohibiting him from paying compensation reflecting the time value of the owner's property or other value for the State's public use of the owner's private property. Motion at 3 (ROA.91).

## II.    FACTS

The Comptroller took custody of the contents of Ambriz's USAA Federal Savings Bank savings account, $25.00, and the State used it for public purposes. Complaint (Doc. 1) ¶¶ 24-25 at 10 (ROA.17). Ambriz intends to claim his property as soon as he has obtained a final ruling from this litigation. *Id.* ¶ 26 at 11 (ROA.18). If he were to claim it before then, the Comptroller would not pay him just (or any) compensation for the State's use of his property during the time the State had the property in its custody. *Id.*; Motion at 3 (ROA.91).

## III.   PROCEDURAL HISTORY

The Complaint alleges that Tex. Prop. Code § 74.501 violates the Takings Clause of the Fifth Amendment to the United States Constitution as applied to the States by the Due Process Clause of the Fourteenth Amendment and the Takings Clause of Article 1, Section 17 of the Texas Constitution ("Article 1, Section 17") by prohibiting the Comptroller from paying just compensation for the State's public use of its citizens' unclaimed property. *See generally* Complaint (ROA.8-25). The Comptroller sought dismissal on jurisdictional grounds under Fed. R. Civ. P. 12(b)(1) based on Ambriz's supposed lack of Article III standing and purported Eleventh Amendment immunity. Motion at 4-14 (ROA.92-102). He also sought dismissal under Fed. R. Civ. P. 12(b)(6) on the basis that no taking of Ambriz's property had occurred because the TUPA had declared it "presumed abandoned." Motion at 14-19 (ROA.102-107).

The Report and Recommendation of the United States Magistrate Judge (Doc. 34) ("R&R") recommended denying the Rule 12(b)(1) portion of the Motion, except for recommending dismissal without prejudice of the Article I, Section 17 claim because the *Ex parte Young* exception to the Eleventh Amendment does not apply to state law claims. R&R, Section III(A) & (B), at 3-10 (ROA.195-202). The Magistrate held that Ambriz pleads claims under the Fifth Amendment for prospective declaratory and injunctive relief falling within the *Ex parte Young*

7

exception, making the Eleventh Amendment inapplicable to those claims. *Id.*, Section III(A), at 3-6 (ROA.195-98).

The R&R does go on to state, "[h]owever, to the extent Ambriz seeks specific damages or a declaration that he or class members are owed specific damages under the statute, that claim does not fall under the *Young* exception." *Id.* at 6 (ROA.198). Because the Complaint does not seek such relief and because Ambriz agrees that the *Ex parte Young* exception does not apply to his Article I, Section 17 claim, Ambriz does not appeal Section III(A) of the R&R regarding Eleventh Amendment immunity as adopted by the district court.

The R&R also recommended denying dismissal based on Ambriz's supposed lack of Article III standing. *Id.*, Section III(B), at 6-10 (ROA.198-202). The Magistrate found that Ambriz sufficiently pleads all three elements of Article III standing and that his claim is ripe. *Id.* Accordingly, Ambriz does not appeal Section III(B) of the R&R as adopted by the district court.

Section III(C) of the R&R did not address the merits of the parties' arguments as to whether the Comptroller's taking custody of and the State then making public use of Ambriz's unclaimed property could constitute a taking because the TUPA had declared it "presumed abandoned." *Id.* at 10-14 (ROA.202-06). Rather, the Magistrate apparently considered himself unable to consider the issue because this Court had cited, in a completely different context and on other issues, an Austin

Court of Appeals opinion that supported the Comptroller's position. *Id.* at 12-13 (ROA.204-05). Consequently, the Magistrate did not consider Ambriz's arguments as to why the Austin Court of Appeals opinion had been incorrectly decided. *Id.* at 10-14 (ROA.202-06). Ambriz appeals Section III(C) of the R&R (ROA.202-06) and that part of Section IV (ROA.206) that recommended dismissal with prejudice pursuant to Rule 12(b)(6) of his declaratory and injunctive claims under the Fifth Amendment as adopted by the district court.

Ambriz timely objected to those portions of the R&R. Plaintiff's Objections to a Portion of the Report and Recommendation of the United States Magistrate Judge (Doc. 37) ("Ambriz Objections") (ROA.216). The Comptroller timely objected to the portions of Sections III(A) and (B) of the R&R that rejected his Article III standing and Eleventh Amendment arguments. Defendant's Objections to the Report and Recommendation of the United States Magistrate Judge (Doc.36) ("Comptroller Objections") (ROA.208).

On July 28, 2023, two days after the briefing on them was complete, the district court entered its Order: (1) overruling both the Ambriz Objections and the Comptroller Objections, (2) adopting the R&R, and (3) accordingly, granting in part and denying in part the Motion by: (a) dismissing without prejudice Ambriz's state law claims and any federal claim seeking retrospective relief or damages, and (b) dismissing with prejudice Ambriz's prospective declaratory and injunctive claims.

Order (Doc. 44) (ROA.274). That same day, the district entered the Final Judgment rendering final judgment pursuant Fed. R. Civ. P. 58, ordering each party to bear its own costs, and closing the case. Final Judgment (Doc. 45) (ROA.276).[1]

On August 9, 2023, Ambriz timely filed Plaintiff's Notice of Appeal which limited his appeal to (1) Section III(C) and the portion of Section IV of the R&R recommending dismissal with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) of his prospective declaratory and injunctive claims on the basis that he had allegedly failed to sufficiently plead a violation of the Takings Clause of the Fifth Amendment; (2) the Order adopting the R&R and overruling Ambriz's Objections to the extent the Order adopts Section III(C) and the corresponding portion of Section IV of the R&R, and (3) the Final Judgment, to the extent it enters judgment against Ambriz with prejudice on his prospective declaratory and injunctive claims under the Fifth Amendment. Plaintiff's Notice of Appeal (Doc.46) (ROA.277).

## SUMMARY OF THE ARGUMENT

Ambriz satisfies all three elements of Article III standing, and his claim is ripe. He satisfies injury in fact by alleging that the State took his property without paying him just compensation. That is both a Constitutional injury and an economic

---

[1] Since the District Court's Order and Final Judgment adopted the R&R, Ambriz will refer herein to the R&R and to the recommendations and reasoning of "the Magistrate."

injury, both quintessential injuries-in-fact. Unsurprisingly, what the Comptroller labels as a challenge to injury-in-fact is not. Rather, he really challenged ripeness below. The Comptroller argued that because he might reject Ambriz's claim for return of his property on some unknown basis, Ambriz will not have suffered an injury-in-fact until he has made a claim for return of his property which the Comptroller accepted and paid without including just compensation.

The Supreme Court has rejected this argument, however. First, it held that a Fifth Amendment takings claim accrues, and the property owner has suffered injury, when the government takes the owner's property into its custody. Second, it held that the property owner need not exhaust administrative remedies so long as it is clear the government will not pay just compensation. That is the case here, because Texas law prohibits the Comptroller from paying just compensation for the State's public use of unclaimed property. For that reason, multiple federal courts considering Takings Clause challenges to unclaimed property statutes where the plaintiffs had not yet made claims for the return of their property expressly or implicitly found the plaintiffs had Article III standing to bring their claims.

Because Ambriz's injury from the Comptroller's refusal to pay him just compensation for the public use of his property flows directly from the State's taking the property and using it for public purposes, he satisfies the traceability element of Article III standing. The Comptroller argues that Ambriz's supposed negligence in

11

failing to engage with his savings account for three years somehow changes that. But, if the Comptroller had not subsequently taken Ambriz's property into custody for the State, which used it for public purposes, no taking would have occurred and Ambriz would have suffered no Fifth Amendment injury. Simply put, no prior inaction of Ambriz disrupts the connection between the Comptroller's subsequent action and his injury.

The declaratory and injunctive relief Ambriz seeks satisfies the redressability element of Article III standing because it will require the Comptroller to pay him just compensation when he claims his property. The Comptroller's challenge to redressability merely repeated his ripeness and traceability arguments, so that challenge fails for the same reasons that the other arguments failed.

Ambriz seeks only declaratory and injunctive relief to require the Comptroller to comply with the Fifth Amendment and pay him just compensation for using his property for public purposes when he makes his claim in the future. That is wholly prospective relief under the Supreme Court's decision in *Edelman v. Jordan*. Ambriz necessarily does not seek redress for a past failure by the Comptroller to pay him just compensation, as he has not yet made a claim for his property. Thus, Ambriz seeks purely prospective relief within the *Ex parte Young* exception to the Eleventh Amendment. Accordingly, the Eleventh Amendment does not bar him from bringing his claim in federal court.

This Court's citation of *Clark v. Strayhorn*, an Austin Court of Appeals case which held that the TUPA does not affect a taking of unclaimed property under the Fifth Amendment, did not compel the Magistrate to accept that case's holding, as he apparently believed. This Court merely cited *Clark* for the correct proposition that Texas law effectively assigns the interest generated by unclaimed property to the State. It did not cite *Clark* for, or approve, its holding that the Comptroller's taking unclaimed property into custody and the State using it for public purposes does not constitute a taking.

In fact, the Comptroller's taking of Ambriz's property into custody for the State, the State using it for public purposes, and the Comptroller refusing to pay just compensation for same, all of which the Comptroller freely admits, fall squarely within the language of the Takings Clause of the Fifth Amendment, "... nor shall private property be taken for public use without just compensation." U.S. Const., Amend. V. *Clark,* erroneously relying upon the Supreme Court's decision in *Texaco Inc. v. Short*, held that because the TUPA characterized unclaimed property as "presumed abandoned," the owners no longer had a property interest in their property. That holding ignored a dispositive difference between the Indiana statute at issue in *Texaco* and the TUPA.

After 20 years of non-use, consistent with the historic, common law meaning of "abandonment," the Indiana statute declared mineral rights "abandoned" and

divested their owners of their property rights in them, causing those rights to revert to the prior owners. The TUPA, in contrast, is a purely custodial statute which never purports to divest unclaimed property owners of title to their property. Rather, it provides that the State shall hold the property in perpetuity for the benefit of its rightful owners. TUPA's use of the misleading term "presumed abandoned" led the *Clark* court into error. Ambriz still owns his property, making it subject to a taking by the State. The better reasoned decisions addressing the constitutionality of custodial unclaimed property laws which deny just compensation agree those laws violate the Fifth Amendment.

Finally, the Comptroller possibly argued below that even if it took Ambriz's property under the Fifth Amendment, $25.00 is such a small amount it does not owe him just compensation. The Supreme Court, however, has held that a governmental entity must pay just compensation if it takes for public use property with a value large enough to generate net interest. $25.00 is large enough to generate net interest.

## STANDARD OF REVIEW

The Court reviews "a Rule 12(b)(6) motion to dismiss *de novo*, accepting all well-pleaded facts as true and drawing all inferences in favor of the plaintiff." *Weyhaeuser C. v. Burlington Ins. Co.*, 74 F.4th 275, 282 (5th Cir. 2023) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Id.* (citation omitted). The Court reviews issues of standing under Article III asserted pursuant to Rule 12(b)(1) under the same *de novo* standard. *Rideau v. Keller Ind. School Dist.*, 819 F.3d 155, 160 (5th Cir. 2016) (citation omitted). Finally, the Court reviews Eleventh Amendment determinations *de novo*, as a question of law, like other questions of subject matter jurisdiction. *Matinez v. Texas Dept. of Criminal Justice*, 300 F.3d. 567, 573 (5th Cir. 2002) (citation omitted).

## ARGUMENT

## I.     AMBRIZ HAS ARTICLE III STANDING TO BRING HIS CLAIMS

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l. USA*, 586 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)). Supreme Court precedent establishes that Ambriz satisfies all three of these elements of Article III standing, and that his claim is ripe. So too does every case which has considered similar takings cases against states based on their refusal to pay just compensation for their public use of their citizens' unclaimed property.

### A.    Ambriz Suffered an Injury-in-Fact and His Claim is Ripe

While the Comptroller labels his argument as a challenge to injury-in-fact, he does not actually argue that.[2] Comptroller Objections at 3-5 (ROA.210-12). Nor could he. Recent Supreme Court precedent dictates that Ambriz has already been injured. "[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019) "If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says—without regard to subsequent state court proceedings. And the property owner may sue the government at that time in federal court for the 'deprivation' of a right 'secured by the Constitution.'" *Id.* (citations omitted).

The Supreme Court explained that "once there is a 'taking,' compensation must be awarded because '[a]s soon as private property has been taken' the owner

---

[2] In fact, the Comptroller labels his argument as Ambriz having failed to allege injury-in-fact because he allegedly failed to allege a taking. State Objections at 3 (ROA.210). Had the Comptroller actually made that argument, this Court would have rejected it out of hand, because a court cannot put the cart before the horse and first determine the merits and then find no standing based upon that decision. *See Air Evac EMS, Inc. v. Texas Dept. of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017) ("Finally, courts recognize the significant overlap between Article III jurisdiction, *Ex parte Young*, and equitable relief.… These doctrines are both threshold questions, however, and do not consider the action's merits.") (citations omitted).

'has already suffered a constitutional violation.'" *Id.* It is also "a classic pocketbook injury sufficient to give … standing." *Tyler v. Hennepin County, Minn.*, 2023 WL 3632754, at *3 (U.S. May 25, 2023). Here, as soon as the Comptroller took Ambriz's unclaimed property into custody and the State used it for public purposes, Ambriz suffered injury-in-fact. That Ambriz will not make a claim to recover his unclaimed property until after this case concludes does not change the fact that he has already suffered an injury from the Comptroller's taking his property into custody and refusing to pay him just compensation. And, that injury is ongoing because the taking without just compensation continues until the Comptroller finally pays the just compensation.

The Comptroller actually challenges ripeness (not injury-in-fact) on the ground that he has not made a final determination of Ambriz's future claim. Comptroller Objections at 3-5 (ROA.210-12). Critically, however, he does not deny that he will refuse to pay just compensation to Ambriz in addition to returning the amount of Ambriz's property he took into the State's custody. Motion at 3 (ROA.91). Rather, he posits several hypothetical reasons why he might deny Ambriz's claim in its entirety, such that the State would never owe Ambriz just compensation. Comptroller Objections at 3-5 (ROA.210-12).

In the R&R, the Magistrate correctly rejected this argument as seeking to impose a finality requirement beyond the minimal requirement established by the

Supreme Court. The Magistrate began by quoting the Supreme Court, "[t]he finality

requirement is relatively modest. All a plaintiff must show is that there is no question

… about how the regulations at issue apply to the particular land in question." R&R

at 9 (ROA.201) (quoting *Pakdel v. City & County of San Francisco, Ca*., 141 S. Ct.

2226, 2230 (2021)). He then summarized the Comptroller's argument and correctly

disposed of it as follows:

> The Comptroller argues that he has not taken a final position on
> Ambriz's abandoned property claim because he might determine that
> Ambriz has not proved the property is in fact his. However, Ambriz
> pleaded that according to the Comptroller's online records, the
> Comptroller holds Ambriz's property, money from a USAA Federal
> Savings Bank savings account. Compl. at ¶ 24. Additionally, citing
> Texas Property Code § 74.304(d), the Comptroller concedes he "has no
> authority to pay interest on unclaimed property claims." Dkt. #21 at 3.
> Thus, whether Ambriz can collect interest under the statute on the
> property held by the State is finally determined.

*Id.*

To go beyond the face of the Complaint and consider every hypothetical

reason why the Comptroller might not pay Ambriz's claim at all would effectively

require this Court to impose an administrative exhaustion requirement. This the

Court cannot do. In *Pakdel*, the Supreme Court stated, "administrative 'exhaustion

of state remedies' is not a prerequisite for a takings claim when the government has

reached a conclusive position." 141 S. Ct. at 2231 (citing *Knick*, 139 S. Ct. at 2167).

While the Supreme Court did go on to say that a state will not have reached a

conclusive position if a real possibility still exists it will pay just compensation, it

rejected the possibility of the plaintiff failing to recover because of "administrative missteps" as preventing ripeness. *Id.* Here, the Comptroller does not dispute that it will refuse to pay just compensation, the real issue. The hypothetical grounds for possible rejection of Ambriz's claim conjured by the Comptroller amount to the equivalent of potential "administrative missteps."

Significantly, multiple federal courts have addressed unclaimed property takings claims where the plaintiff filed suit without first making a claim to the state. All have either held or assumed that the plaintiff had suffered injury-in-fact and had ripe takings claim. For example, in *Cerajeski v. Zoeller*, the Seventh Circuit held, "[t]he plaintiff is entitled to just compensation from the state *when* she files her claim to Cerajeski's account…." 735 F.3d 577, 583 (7th Cir. 2013) (emphasis added). Likewise, in *Kolton v. Frerichs*, the Seventh Circuit held that a plaintiff who had not yet made a claim for the unclaimed property could sue for declaratory relief. 869 F.3d 532, 535-36 (7th Cir. 2017)

A Maryland district court in *Albert v. Franchot* addressed this issue at length, explaining the reason why, like Ambriz here, the plaintiff had suffered injury-in-fact and had a ripe claim despite not having made a claim to the State before filing suit:

> The failure to allege that they were not compensated, or did not seek compensation from the State, is not required for Plaintiffs to have standing under the Takings Clauses of the United States and Maryland Constitutions. It is the State's custody of unclaimed property, and use of it for public benefit without compensating the owner, that qualifies as a taking. Under the Act, compensation is made subsequent to the

> State taking possession and making use of private property. *Knick*
> unequivocally holds that a constitutional taking and attendant injury
> arise at the moment the State exerts custody over the property. 139
> S. Ct. at 2172. Plaintiffs' Article III injury is the taking itself,
> notwithstanding the Act's procedure through which an owner may seek
> recompense.

2023 WL 4058986, at *8 (D. Md. June 16, 2023) (motion for reconsideration

pending).

A Florida district court likewise held that unclaimed property owners who had

not made a claim for return of their property had Article III standing:

> [Plaintiffs] have standing because they assert a colorable … claim they
> have lost and are continuing to lose, every day, compensation that they
> are entitled to under the federal and state constitutions. This is a
> colorable claim that, at least going forward, the defendant must pay
> [Plaintiffs] money, and that they are entitled to declaratory relief to that
> effect. The loss is small, but a loss of money supports standing; no
> minimum amount is required.

Order of Dismissal (Doc. 27) at 6, *Maron v. Patronis*, Case No. 4:22cv255-RH-MAF

(N.D. Fla. Sept. 5, 2023).

In summary, the Comptroller's argument against ripeness, without stating it,

relies upon an administrative exhaustion requirement expressly rejected by the

Supreme Court. Further, multiple federal courts ruling upon claims like Ambriz's

with plaintiffs in the same procedural posture as Ambriz expressly or implicitly

found the plaintiffs had satisfied the injury-in-fact and ripeness elements of Article

III standing.

**B.      Ambriz's Injury is Fairly Traceable to the Comptroller's Wrongful Conduct**

"The 'fairly traceable' requirement does not strictly demand proximate causation, but there must be a sufficient connection between the plaintiff's injury and the conduct of the defendant, such that a court ought to assert jurisdiction over the dispute." *Franchot*, 2023 WL 4058986, at *9 (citations omitted). The Comptroller argues that such a connection does not exist because "the alleged injury was due entirely to his [Ambriz's] own neglect" given that Ambriz had engaged in no activity in the savings account for three years, thereby making it subject to transfer to the Comptroller as "presumed abandoned" property. Comptroller Objections at 5-6 (ROA.212-13).

The Magistrate had properly made short work of rejecting this argument:

> Next, the Comptroller argues Ambriz's injury is not traceable to the Comptroller because "if Plaintiff had not forgotten about his $25 deposited with USAA, he would have had the benefit of its use. Plaintiff's asserted 'injury' is solely the result of his own making and neglect." Dkt. #21 at 13. The court disagrees. The alleged injury is the State's use of Ambriz's property without compensation. That injury only occurs when the State takes possession of Ambriz's property. Accordingly, the undersigned finds Ambriz's alleged injury is sufficiently traceable to the Comptroller.

R&R at 10 (ROA.202). Quite the opposite of the Comptroller's spin, his conduct alone caused the taking and the resulting loss to Ambriz.

The Comptroller's argument, of course, assumes that Ambriz's conduct constituted negligence. However, Ambriz does not plead, and no evidence supports,

that he even knew about or remembered the savings account, much less acted negligently by his lack of engagement with it. "There are probably many reasons why owners allow their deposit accounts … to remain inactive for significant periods, but not all owners do so simply out of 'neglect.'" J. Orth, *Interest Follows Principal: Why North Carolina Should Pay Interest on Unclaimed Personal Property*, 37 Campbell L. Rev. 321, 331 (Spring 2015).

The Comptroller's argument also assumes that legally a person's negligence could nullify the traceability between a governmental taking and a citizen's resulting injury. But the Comptroller cites no authority that a citizen's supposed negligence as to their property could deprive that citizen of standing to sue the state for taking that property. Nor does the Comptroller cite any authority that a state can take a citizen's property and make public use of it without paying just compensation based on the citizen's supposed negligence as to the property. Quite the contrary, only abandonment--the voluntary relinquishment or renunciation of a property right--can strip away ownership rights and allow the government to take property without paying just compensation. *Cerajeski*, 735 F.3d at 581.

*Ass'n of Cnty. Organizations for Reform v. Fowler*, 178 F.3d 350 (5th Cir. 1999) does not support that negligence by a property owner, as opposed to voluntary abandonment, allows a taking without just compensation. There, the organizational plaintiff claimed as its injury the costs it incurred in suing the county for its illegal

activity. *Id.* at 358. This Court merely held that the organization's costs resulting from its *intentional* conduct in filing suit ("self-inflicted" injury) did not satisfy traceability. *Id.* That is a far cry from holding that supposed negligence can prevent traceability, especially in a takings case.

In summary, Ambriz satisfies traceability easily because his loss from the Comptroller's taking of his money and refusal, pursuant to statute, to pay him just compensation for the public use of his property flows naturally and directly from that refusal. *See Maron*, Order at 6 ("[T]he loss is traceable to the challenged statute….").

### C.     The Declaratory and Injunctive Relief Ambriz Seeks Will Redress His Injury

The Magistrate correctly held that the Comptroller's redressability arguments in the Motion merely reasserted his injury-in-fact and traceability arguments, and the Magistrate rejected them for the same reasons he rejected those arguments. R&R at 10 (ROA.202). This Court should do the same. Further, in a virtually identical takings case, a Florida district court wrote, "[I]t is likely, indeed almost certain, that the injury would be redressed, at least going forward, by the declaration that [Plaintiffs] seek." *Maron*, Order at 6.

## II. THE ELEVENTH AMENDMENT DOES NOT BAR AMBRIZ'S CLAIM UNDER THE FIFTH AMENDMENT FOR PROSPECTIVE DECLARATORY AND INJUNCTIVE RELIEF

In the R&R, the Magistrate correctly held that the Eleventh Amendment does not bar Ambriz's federal claims because they fall within the exception for prospective relief established by *Ex parte Young*, 209 U.S. 123 (1908). R&R at 3-6 (ROA.195-98). In *Ex parte Young*, the Supreme Court created an exception to the Eleventh Amendment for suits against state officials in their official capacities seeking only injunctive or declaratory relief. It did so under the theory that "a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1207 (N.D. Fla. 2020) (citations omitted). Here, because Ambriz seeks purely prospective declaratory and supplemental injunctive relief, the Magistrate correctly held that this exception takes Ambriz's claims out of the bar of the Eleventh Amendment.

Recognizing this, the Comptroller tries to recast Ambriz's claims as ones for retrospective monetary relief falling outside the *Ex parte Young* exception. Comptroller Objections at 1-2 (ROA.208-09). The Comptroller bases this attempt solely on *Edelman v. Jordan*, 415 U.S. 651, 667 (1974). *Id.* In doing so, the Comptroller first ignores that the Supreme Court held the exception applicable to the

24

pure declaratory relief sought by the plaintiffs in that case. *Id.* at 664 (holding the prospective portion of the district court's order was analogous to the prospective-only relief awarded in *Ex parte Young*). Instead, the Comptroller quotes language holding the exception inapplicable only to the requested supplemental relief because it sought the payment of money from state treasuries based on *past* transactions in which Illinois had failed to pay the plaintiffs in full (i.e., sought indisputably retrospective relief). In truth, *Edelman* supports the applicability of *Ex parte Young* to Ambriz's claims.

In *Edelman*, the plaintiffs sought, and the district court awarded, a declaration that a state manual that conflicted with federal regulations was invalid, a permanent injunction requiring Illinois to comply with the federal regulations in the future, and an order requiring the payment of benefits wrongfully withheld in the past ("equitable restitution"). 415 U.S. at 656. The Supreme Court approved the application of *Ex parte Young* to the prospective portion of the district court's judgment (the declaration and injunction requiring compliance with the federal regulations in the future). *Id.* at 664. So too here, the Magistrate held, and this Court should affirm, that *Ex parte Young* applies to Ambriz's request for the Court to: (i) declare unconstitutional Tex. Prop. Code §§ 74.304(d) and 74.501(b) because they bar the Comptroller from paying just compensation for the State's use of unclaimed property in violation of the Takings Clause of the Fifth Amendment, and (ii) enjoin

the Comptroller to comply with the Constitution *going forward* by paying just compensation to Ambriz and Class members seeking to recover unclaimed property *in the future*. Complaint (Doc. 1) at 5 ¶ 10 & 14 ¶ 37 (ROA.12, 21). *See* R&R at 3-6 (ROA.196-98).

In holding that such relief requiring payment to future applicants in accordance with federal law falls within the *Ex parte Young* exception, the Supreme Court first noted that "[a]s in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman*, 415 U.S. at 667. This requires courts to examine the practical effect of the relief sought. *Id.* at 668. While the Eleventh Amendment typically would bar claims resulting in a money judgment payable out of state funds, that does not mean that proper prospective relief cannot have a fiscal impact on a state. *Id.* at 666–67.

To the contrary, a state can suffer fiscal consequences when the relief sought obligates the state to comply with federal law in the future. *Id.* at 667–68. "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*." *Id.* at 668. It is for that reason that the injunction in *Edelman* requiring future compliance with the regulations which would result in increased payments to future applicants constituted prospective relief. *See id.*

In contrast, the Supreme Court held that the "equitable restitution," which required payment to *past applicants* who were not paid or who were underpaid was retrospective and that it therefore fell outside of the *Ex parte Young* exception. *Id.* at 668. That was because it would have required "payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to *past applicants*" as to whom Illinois had already violated the federal regulations. *Id.* (emphasis added).[3] Critically, here Ambriz only seeks necessary or proper supplemental relief corresponding to his declaratory relief, including an injunction requiring the Comptroller to pay just compensation in connection with future claims for the return of property, making it purely prospective relief under *Edelman*. Complaint [Doc. 1] at 15 ¶ 39 (ROA.22).

Significantly, multiple other courts which have considered relief like that sought by Ambriz here held it falls within the *Ex parte Young* exception. In *Kolton*, the plaintiffs challenged the constitutionality of the Illinois Disposition of Unclaimed Property Act, seeking declaratory and injunctive relief as well as

---

[3] The Ninth Circuit's opinion in *Suever v. Connell* comports with this holding in *Edelman*. 579 F.3d 1047, 1058-59 (9th Cir. 2009). The plaintiffs had all made claims in the past to the State of California and had their claims paid with some interest which they thought insufficient. *Id.* at 1052-53. The Ninth Circuit held that their claims for "retrospective interest" did not fall within the *Ex parte Young* exception. *Id.* at 1058-59.

damages. 869 F.3d at 533. The Seventh Circuit held that as to the declaratory and injunctive relief "[p]laintiffs are entitled to prospective relief under *Ex parte Young*,…." *Id.* at 536.

In *Siebers v. Barca*, the plaintiff sought a declaration as to the unconstitutionality of the Wisconsin Unclaimed Property Act's prohibition of the payment of interest on unclaimed property that was not interest-bearing when the state took it into custody and an injunction requiring the state to pay interest on property returned in the future. 2022 WL 2438605, at *1, 6-7 (W.D. Wis. Jul. 5, 2022). The court held:

> But plaintiffs also ask the court for an injunction that prohibits defendants from refusing to pay all earned interest on plaintiffs' unclaimed property moving forward, and an injunction that requires the state to hold interest earned on unclaimed property in a separate account. That is prospective relief.
>
> The court concludes that under *Ex parte Young*, *plaintiffs may seek injunctive and declaratory relief aimed at securing state-earned-interest on claims that have not yet been paid by the state.* If plaintiffs succeed on the merits of their claim later in the case, this relief would require the state to settle claims in compliance with federal law in the future.

*Id.*, at *7 (emphasis added) (citing *Cerajeski*, 735 F.3d at 579 (plaintiff awarded declaration that she was entitled to interest on her unclaimed property when she later filed a claim for the return of her property)).

Here, the Magistrate found the foregoing analysis dispositive, holding "[c]onsistent with *Edelman* and *Siebers v. Barca*, 2022 WL 2438605 (W.D. Wis.

28

Jul. 5, 2022), the undersigned finds Ambriz's claims for prospective declaratory or injunctive relief that Texas must pay interest on the unclaimed property it holds falls within the *Ex parte Young* exception, even if those claims will ultimately result in payment by the State." R&R at 6 (ROA.198). The Magistrate then stated that, "[h]owever, to the extent Ambriz seeks *specific damages* or a declaration that he or class members are owed *specific damages* under the statute, that claim does not fall under the *Young* exception." *Id.* (citation omitted) (emphasis added). That latter statement has no significance to the case, because Ambriz does not seek specific damages or a declaration that he or class members are owed specific damages.

Subsequently, the District Court of Maryland held *Ex parte Young* applicable in a virtually identical case. *See Albert*, 2023 WL 4058986. In *Franchot*, the plaintiff sought a declaration that Maryland's unclaimed property act violated the Fifth Amendment by forbidding the state from paying just compensation for its public use of the unclaimed property and that it must pay just compensation on future claims according to a standard to be set by the court, and an injunction requiring the state to comply with the declaration. *Id.*, at \*3. Here, Ambriz seeks virtually identical relief. The Maryland court held "the Complaint seeks prospective injunctive and declaratory relief as allowed under the *Ex parte Young* doctrine" and "[t]hat Defendant may have to spend state funds to effect compliance with federal law does not remove Plaintiff's claims from the *Ex parte Young* exception." *Id.*, at \*5.

Most recently, in a suit challenging the Florida Disposition of Unclaimed Property Act, a Florida district court held, "[Plaintiffs] assert … a § 1983 claim … for a declaration that defendant must pay interest or other compensation for use … of unclaimed funds … going forward. The claim for prospective relief is a proper *Ex parte Young* claim … not barred by the Eleventh Amendment." *Maron*, Order at 8.

Ambriz knows of only one contrary decision, *Cole-Kelly v. Yee*, 2023 WL 2480749, at *3-4 (N.D. Cal. Mar. 13, 2023), currently on appeal. The court erred in relying on *Suerver*, 579 F.3d at 1059, where the plaintiffs sought interest not paid on past claims rather than seeking payment of just compensation on future claims like the plaintiffs before that court and Ambriz here. The court's reliance on *Turnacliff v. Westly*, 546 F.3d 1113, 1115 (9th Cir. 2008) is even more misplaced, because that decision did not even address the Eleventh Amendment.

Consistent with *Edelman*, the case upon which the Comptroller rests its entire argument, and four of the five other unclaimed property takings cases like this one, this Court should affirm the Magistrate's holding that the Eleventh Amendment does not bar Ambriz's Fifth Amendment Takings Clause claim.

But even if the *Ex parte Young* exception does not apply to Ambriz's Takings Clause claim, the Eleventh Amendment does not bar it, because the State consented to suit in federal court, thereby waiving its immunity under that amendment, pursuant to the "plan of the Convention." That is the logical extension of the

Supreme Court's recent holding in *PennEast Pipeline Co., L.L.C. v. N.J.* *("PennEast")*, 141 S. Ct. 2244 (2021).

In *PennEast*, the Supreme Court held that one method by which states consented to suit, waiving their sovereign immunity, was by agreeing "to suit in the 'plan of the Convention,' which is shorthand for 'the structure of the original Constitution itself.'" *Id.* at 2258 (citations omitted). This applies to both their general immunity from suit anywhere, their "structural immunity," and their "Eleventh Amendment immunity"—their immunity from suit in federal court even where sovereign immunity would not apply to the same suit brought against them in state court. *Id.* at 2262.

In *PennEast*, the Supreme Court applied these principles in holding that the federal government and its private delegees can bring federal eminent domain proceedings against states in federal court. *Id.* at 2259, 2263. The Supreme Court reached this conclusion by observing that "governments have long taken property for public use without the owners' consent" and that prior to and at the time of the founding, governments "could either initiate legal proceedings to secure the right to build, or they could take property up front and force the owner to seek recovery for any loss of value." *Id.* at 2254-55. The Takings Clause of the Fifth Amendment "recognized the existence of such a power" in the federal government as well as the states. *Id.* at 2255.

31

The other side of this coin is that at the time of the founding not only was the power of eminent domain firmly established, so too was the right of property owners to sue for just compensation when government exercised eminent domain. The self-executing Takings Clause of the Fifth Amendment made clear this principle applied to the federal government. Of course, the Fourteenth Amendment served to apply the Takings Clause to the states. *Webb's Fabulous Pharmacies, Inc. v. Beckwith ("Webb's")*, 449 U.S. 155, 160 (1980).

So, the Constitution and specifically the Fifth Amendment inherently reflect a consent to suit (a waiver of sovereign immunity) by both the federal government and the states for Takings Clause claims, including consent by the states to suit in federal court. *See Jacobs v. U.S.*, 290 U.S. 13, 16 (1933) ("[T]he right to recover just compensation for property taken by the United States for public use … rested upon the Fifth Amendment. *Statutory recognition was not necessary*.") (emphasis added). Simply put, no need exists for a statutory waiver of sovereign immunity; that is inherent in the Constitution and the Fifth Amendment.

The State will likely argue that this Court rejected this argument in *Bay Point Properties, Inc. v. Miss. Transp. Commission ("Bay Point")*, 937 F.3d 454, 455 (5th Cir. 2019). But the Supreme Court's subsequent opinion in *PennEast* supersedes that decision. In *Bay Point*, this Court, not having the benefit of *PennEast*, did not consider whether the states had consented to suit against them under the Takings

32

Clause as "part of the plan of the Convention." In the unlikely event the Court does not apply the *Ex parte Young* exception to Ambriz's claims, it can now consider the issue of State consent.

## III.  THE COMPLAINT STATES AN ACTIONABLE CLAIM UNDER THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT, AS APPLIED TO THE STATES BY THE FOURTEENTH AMENDMENT

### A.    The Contours of a Takings Claim

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but rather it serves as a mechanism for vindicating rights otherwise protected by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002). To state a Section 1983 claim, a plaintiff must show a deprivation of a right secured by the Constitution or the laws of the United States by a person acting under color of state law. *See* 42 U.S.C. § 1983. The Comptroller does not dispute that he is a person acting under color of state law.

Count I pleads a claim under Section 1983 for violations of the Takings Clause of the Fifth Amendment, which provides: "... nor shall private property be taken for public use without just compensation." U.S. Const., Amend. V. It applies to the states as well as to the federal government. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 307 n.1 (2002).

The Supreme Court has held that the Takings Clause "requires the payment of compensation whenever the government acquires private property for a public purpose." *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (internal quotations omitted). "The Government has a categorical duty to pay just compensation [upon a taking]." *Horne v. Dept. of Agric.*, 576 U.S. 350, 358 (2015). The Takings Clause is "self-executing," abrogating sovereign immunity and requiring states to provide a specific remedy for takings in their own courts. *Knick*, 139 S. Ct. at 2172. A claim for just compensation arises immediately at the time of the taking. *Id.* at 2171.

"No magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." *Ark. Game & Fish Comm'n v. U.S.*, 568 U.S. 23, 31 (2012). Yet, the Supreme Court has repeatedly held that "the 'classic taking [is one] in which the government directly appropriates private property for its own use.'" *Horne*, 576 U.S. at 357 (quoting *Tahoe–Sierra Pres. Council, Inc.*, 535 U.S. at 324). Governmental appropriations of personal property for public use constitute *per se* takings. *Id.* at 360; *see also Cedar Point Nursery*, 141 S. Ct. at 2074 ("[t]he government commits a physical taking" when it "takes possession of property without acquiring title to it"). This includes both money and the interest earned, or that could be earned, on that money. *Webb's*, 449 U.S. at 164. And even temporary possession and use of property by the government can trigger *per se* physical takings liability. *Cedar Point Nursery*, 141 S. Ct. at 2074.

**B.    The TUPA Affects a Taking Requiring Just Compensation by Mandating Public Use of Unclaimed Property in the State's Custody**

The Comptroller admits that the State makes public use of the unclaimed property he takes into its custody and that he does not pay any compensation to the property's owner for that use. Motion at 15-19 (ROA.103-07). However, he argued in the Motion that such use does not constitute a "taking" under the Fifth Amendment and that even if it does, Ambriz has not suffered a compensable loss. *Id.* The first argument fails because it is based on a series of cases that misapplied the Supreme Court's decision in *Texaco, Inc. v. Short*, 454 U.S. 516 (1982), as better reasoned cases have explained. The second argument fails because a property owner suffers a compensable loss if the property taken could earn net interest, which is the case with Ambriz. The Comptroller effectively conceded this point below.

1.    The Magistrate Incorrectly Regarded His "No Taking" Finding as Required by this Court's Decision in *In re Lease Oil Antitrust Litig.*

The Magistrate rested his "no taking" finding entirely upon this Court's citation of *Clark v. Strayhorn*, 184 S.W.3d 906 (Tex. App.—Austin 2006, pet. denied), *cert. denied*, 127 S. Ct. 508 (2006), and supposed approval of that case's "no taking" holding. *See* R&R at 12-13 (ROA.204-05) (citing *In re Lease Oil Antitrust Litig.* ("*Lease Oil*"), 570 F.3d 244, 250-51 (5th Cir. 2009)). The Magistrate did not address Ambriz's arguments regarding why *Clark* was incorrectly decided

or any of Ambriz's arguments on the merits of the takings claim, because he apparently thought himself constrained by this Court's citation of *Clark*. *Id.* The Magistrate was mistaken.

In *Lease Oil*, this Court addressed whether the TUPA gave the State an interest in unclaimed class action settlement funds sufficient to justify its intervention in the class action case. *Id.* at 246. In holding that the State had a sufficient interest to intervene, this Court cited *Clark* for the proposition that "[t]he state is not required to pay interest earned from the property to the original owners." *Id.* at 250.

In context, this Court clearly cited *Clark* merely for the correct proposition that Texas statutory law forbids payment of interest earned by the State to the owners of unclaimed property (thereby assigning the interest to itself): " … Texas *does* have a legally protectable interest: a property right in interest from the unclaimed funds **that is recognized under state law**. *See* TEX. PROP. CODE § 74.709." *Id.* at 251 (italic emphasis in original, bold emphasis added). The Court did not cite *Clark* for the further proposition that the State's public use of the unclaimed property cannot constitute a taking. It made no mention of the constitutionality of the Comptroller's action.

Indeed, no inconsistency exists between the State having an interest in the income generated by unclaimed property and it owing the obligation to pay just compensation to the owners of the unclaimed property for the government's use of

it for public purposes. As discussed further below, the just compensation owed by the State for its public use of unclaimed funds is not necessarily the income earned by the funds; it may be the income the funds could have generated in the owners' hands.

Further, it is incorrect to say, as the Magistrate did, that this Court "approved" *Clark*. R&R at 13 (ROA.205). The issue before the Court turned on whether the State had a property interest in the unclaimed settlement funds or the interest generated by them, and it naturally turned to a Texas court of appeals opinion on the issue for that answer.[4] It simply accepted that limited holding without examining it or approving it. So, the Magistrate incorrectly acted as if this Court had left him no choice, and he erred in not considering whether *Clark* was correctly decided, which it was not. Accordingly, this Court should find *In re Lease Oil* in no way prevents it from reversing the district court.

> 2.   As the Better Reasoned Decisions Demonstrate, *Clark* Was Wrongly Decided, and the TUPA Affects a Taking Under the Fifth Amendment

In *Clark*, the court properly recognized that under Supreme Court precedent "'the earnings of a fund are incidents of ownership of the fund itself and are property

---

[4] The Court followed the lead of the Supreme Court in *Webb's* where it accepted the Florida Supreme Court's holding that a statute assigned interest earned on interpleaded funds to the county but then held the statute affected an unconstitutional taking. 449 U.S. at 160, 164-65.

just as the fund itself'" that can only be confiscated under the Fifth Amendment's Takings Clause with the payment of just compensation. 184 S.W.3d at 914 (quoting *Webb's*, 449 U.S. at 164). To avoid the application of this "interest follows the principal" rule to unclaimed property, relying on the Supreme Court's decision in *Texaco*, the court held that the TUPA's declaration of unclaimed property as "presumed abandoned" divested the property owners of a property interest subject to a "taking." *Id.* at 913-15. In doing so, the court failed to recognize a critical distinction between the absolute "escheat" statute the Supreme Court considered in *Short* and the custodial statute that the TUPL constitutes. The former extinguishes private ownership; the latter does not. The distinction is constitutionally dispositive.

As the *Clark* court recognized, unclaimed property schemes are either absolute escheat statutes or custodial statutes. *Id.* at 911. "Under absolute escheat statutes, title passes to the State." *Id.* "Custodial statues, by contrast, do not divest the 'true owner' of title…." *Id.* (citation omitted). Critically, unlike the inapplicable Chapter 71, the TUPA is custodial. *Id.* As the Comptroller admits, Chapters 72 and 73 of the TUPA never actually declare unclaimed property "abandoned" or transfer title of the property to the State; rather, the State holds the unclaimed property in custody indefinitely for its "rightful owners," who may claim it at any time. Motion at 2, 16 (ROA 90, 104).

In contrast, the Supreme Court in *Texaco* considered an absolute "escheat" statute: an Indiana law that declared abandoned mineral leases that sat unused for 20 years[5] and caused such leases to self-terminate such that the lessee's interest reverted to the lessor—i.e., the lessee's interest terminated entirely.[6] 454 U.S. at 518. The Supreme Court held that because the owners had abandoned their mineral leases for longer than the designated time and the statute consequently terminated their ownership of them, the former lessees no longer had any property interest subject to a taking. *Id.* The statute was thus consistent with "state law … 'traditional property law principles,' plus historical practices and this Court's precedents" regarding abandonment which provide that it only occurs when the property owner by express statement or conduct has voluntarily relinquished all rights in the property. *Tyler*, 2023 WL 3632754, at *4, 8 (citations omitted).

The *Clark* court erroneously failed to consider the critical distinction between unclaimed "presumed abandoned" property held in custody by the State under the

---

[5] Specifically, the mineral rights owner abandoned those rights by failing to take any of three steps to establish they had a continuing interest in the property: (1) engaging in actual production or collecting rents or royalties from another person doing so or proposing to do so, (2) paying taxes on the property, no matter how small, or (3) making the minimal effort of filing a written statement of claim with the county. *Texaco*, 454 U.S. at 529.

[6] For convenience, Ambriz refers to the statute in *Texaco* as an "escheat" statute, although it does not technically constitute one, because under the statute, Indiana did not take custody of the mineral rights, as explained.

TUPA for its "rightful owners" and truly abandoned property, the title to which the State escheated to itself or conveyed to another party. In ,, however, Judge Posner and the Seventh Circuit did consider this distinction and found it dispositive. 735 F.3d at 579.

The Seventh Circuit began with the meaning of "abandoned" as the Supreme Court used it *Texaco* and why abandoned property can be subject to a "taking":

> 'Abandonment' in property law means voluntary relinquishment or renunciation of a property right…. (citations omitted). It means that the owner gives up all rights to the property, thus pitching it back into the public domain, where it is available for reappropriation. *Of course*, the state can take abandoned property without compensation—there is no owner to compensate. That is a clear example of escheat.

735 F.3d at 581 (emphasis in original). *See Texaco*, 454 U.S. at 530 ('[A]fter abandonment, the former owner retains no interest for which he may claim compensation. It is the owner's failure to make any use of the property [for 20 years] … that causes the lapse of the property right….").

Anything short of true abandonment and properly conducted absolute escheat proceedings cannot justify a state's refusal to pay just compensation for its public use of private property. Consequently, statutes like the TUPA which never purport to divest a citizen of their ownership of their unclaimed property do not render that unclaimed property "abandoned." Thus, such statutes affect a "taking" by assuming custody of property and using it for public purposes.

40

Further, "'a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law.'" *Cerajeski*, 735 F.3d at 582 (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998)). This includes the "interest follows principal" rule. *Id.* In particular, "[a] state may not 'transform private property into public property without compensation' merely 'because it is held temporarily by the [state].'" *Id.* (quoting *Webb's*, 449 U.S. at 164).

As the Supreme Court explained:

Neither the Florida Legislature by statute, nor the Florida courts by judicial decree, may accomplish the result the county seeks simply by recharacterizing the principal as "public money" because it is held temporarily by the court. The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property. The state statute has the practical effect of appropriating for the county the value of the use of the fund for the period in which it is held in the registry.

To put it another way: a State, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power.

*Webb's*, 449 U.S. at 164.

"And a state may not escheat property without a judicial or administrative determination that the property has been abandoned or is otherwise subject to escheat." Cerajeski, 735 F.3d at 582 (citations omitted). The Indiana Unclaimed Property Act did not provide such a procedure prior to 25 years when actual escheat

would take place (*id.* at 578, 583), and the TUPA never does so, unlike the inapplicable Chapter 71. Chapter 71 does, however, demonstrate that the Texas Legislature understood the type of process necessary to affect a true escheat.

In *Cerajeski*, the Seventh Circuit held that the Indiana Unclaimed Property Act did not provide any elements necessary to a true escheat that could divest a property owner of ownership and thereby prevent the confiscation of the interest earned by (or the time value of) the property it took into custody from constituting a "taking."[7] *Id.* Indeed, the State of Indiana expressly disavowed ownership of the unclaimed property it held in custody. *Id.* Simply put, so long as the original owner retains title to their property, that owner has the right to just compensation for the public use of that property by the State. *See id.* at 583. This applies fully to Ambriz's unclaimed property, given that the TUPA, like the Indiana Unclaimed Property Act, never divested Ambriz of ownership of his property.

The Seventh Circuit surmised what led the State of Indiana into error, the same thing that led the *Clark* court and the other courts discussed below into error: "a

---

[7] The Seventh Circuit has twice reaffirmed its holdings in *Cerajeski* in connection with the Illinois Disposition of Unclaimed Property Act. First, in *Kolton v. Frerichs*, it held that a plaintiff need not make a claim to the state for the unclaimed property or bring suit in state court before filing suit in federal court. 869 F.3d at 535. Second, in *Goldberg v. Frerichs*, it held that the property owner's right to just compensation does not depend upon whether the money was held in an interest-bearing account at the time it was transferred to the State if it could earn net interest. 912 F.3d 1009, 1012 (7th Cir. 2019).

misunderstanding of the concept of abandonment … fostered by the misleading term 'presumed abandoned' in the Unclaimed Property Act." *Id.* at 582. Regardless of its use of the term "presumed abandoned," the TUPA does not purport to declare that the owners of unclaimed property have abandoned that property and thereby relinquished ownership of it. To the contrary, the TUPA expressly recognizes that the owners of unclaimed property have not abandoned their property and that they retain their ownership in perpetuity, as the Comptroller freely admitted in the Motion. Because Texas citizens continue to hold title to their unclaimed property under the TUPA, if the State makes public use of that unclaimed property or its fruits, the Fifth Amendment requires the Comptroller to pay just compensation even though the State holds the property in its custody.

In *Sogg v. Zurz*, the Ohio Supreme Court likewise held *Texaco* inapplicable and that an unclaimed property act that does not declare unclaimed property to constitute abandoned property leaves unclaimed funds the property of its original owners and subject to a "taking":

> [*Texaco*] … is irrelevant … because … nothing in the UFA indicates an intent to change the ownership of the unclaimed funds…. 'Unclaimed funds' are not abandoned; they are the property of their owner. Accordingly, the state may not appropriate for its own use, against the owner of the underlying property, interest earned on that property.

905 N.E.2d 187, 191, 192-93 (Ohio 2009).

All but two of the cases cited by the Comptroller below suffer from the same fatal flaw as *Clark*. Misled by their states' unclaimed property acts' use of the "presumed abandoned" term, they inappropriately relied on *Texaco* by considering unclaimed property abandoned when the unclaimed property acts did not purport to declare the property abandoned. And all but one of those cases did so, like *Clark*, without even considering this critical distinction. *See Dani v. Miller*, 374 P.3d 779, 793-94 (Okla. 2016); *Smolow v. Hafer*, 959 A.2d 298, 303-304 (Pa. 2008); *Rowlette v. State*, 656 S.E.2d 619, 719-26 (N.C. Ct. App. 2008); *Hooks v. Kennedy*, 961 So.2d 425, 431-32 (La. Ct. App. 2007).

The Third Circuit in an unpublished, non-precedential opinion did erroneously hold insignificant the distinction between unclaimed property only "presumed abandoned," the title to which remained with its owners, and abandoned property, title to which escheated to the state. *See Simon v. Weissmann*, 301 Fed. App'x. 107, 114 (3d Cir. 2008).[8] It reasoned that because the state could have declared the property abandoned and escheated the property, in which case no taking would have occurred, it should not matter that the state chose only to take temporary custody of the property. *Id.* This reasoning has two fatal flaws.

---

[8] Another court recently dismissed claims like Ambriz's citing *Simon* and adopting its reasoning *in toto*. *See Maron*, Order at 9-11. The reasons given hereafter as to why *Simon* was wrongly decided apply equally to *Maron*.

First, while a state can under proper circumstances and following proper due process procedures declare property abandoned and take title to it, the Third Circuit did not consider whether that would have been true under the Pennsylvania statute. Rather, it just assumed the constitutionality of all absolute escheat statutes. Here, the TUPA transfers most property as unclaimed after only three years of non-activity or contact and without any administrative or judicial determination of abandonment. *See* Tex. Prop. Code Ann. §§ 72.101(a), 73.101(c) & 73.102. However, "3 years [is] … a period so short as to present a serious question whether it is consistent with the requirement in the Fourteenth Amendment that property not be taken without due process of law, implying adequate notice and opportunity to contest." *Cerajeski*, 755 F.3d at 582. Again, Chapter 71 demonstrates the Legislature's awareness of the type of process necessary to constitutionally divest a citizen of title to their property.

Second, even if the State could have taken title to Ambriz's property after only three years of being "unclaimed," and with no due process, and thereby avoided the obligation to pay just compensation for its use of the property, it does not follow that having failed to take that step it need not pay just compensation. To condone that reasoning would allow a state to accomplish by illegal means any outcome which it could have achieved by legal means.

Indeed, for this reason, the Supreme Court rejected the Third Circuit's rationale in a case where the government physically took raisins from their owners

and then argued that no taking occurred because it could have accomplished the same objective by a regulation limiting production which would have had the same economic effect on the owners. *Horne*, 576 U.S. at 362. The Court wrote:

> A physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower. The Constitution, however, is concerned with means as well as ends. The Government has broad powers, but the means it uses to achieve its ends must be "consist[ent] with the letter and spirit of the constitution. As Justice Holmes noted, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way."

*Id.* (internal citations omitted).

Further, just four months ago, the Supreme Court emphatically reaffirmed that a state cannot by statute declare abandoned property that it wishes to take without paying just compensation and avoid a Fifth Amendment taking where the statute departs substantially from the common law concept of abandonment. *Tyler*, 2023 WL 3632754, at *4, 8. Specifically, the Supreme Court held that Minnesota could not sidestep the Takings Clause by declaring a home abandoned based on three years of nonpayment of property taxes. *Id.* In so holding, the Supreme Court drew upon other Minnesota law and "traditional property law principles, plus historical practice and this Court's precedent," which all provided that the owners of property foreclosed for nonpayment of taxes retained ownership of excess proceeds from the sale. *Id.* The Supreme Court found very significant that historically Minnesota had recognized that property owners retained a right to any surplus from a property tax

foreclosure and that Minnesota law recognized that they retain ownership of any surplus in the context of all other collection foreclosures, governmental or private. *Id.*, at *4, 7.

The Supreme Court contrasted the Minnesota statute with the Indiana statute in *Texaco* which terminated mineral interests after the owners had made no use of them for 20 years and failed to file paperwork claiming ownership of the interest. *Id.*, at *8. For there to be "abandonment" that divests a person of ownership, there must be "a surrender or relinquishment or disclaimer" of all rights in the property, "and for a lengthy period of time," which was true under the Indiana minerals statute, but not under the Minnesota foreclosure statute. *Id.* Critically, a statute inconsistent with that rule, like the Minnesota statute and the TUPA, cannot divest a property interest subject to the Takings Clause. *Id.*

Here, as explained previously, the TUPA does not escheat property, but rather transfers it to the Comptroller for the State to hold in custody for its owner, making *Texaco*, an "escheat" case, inapplicable. But even if the TUPA did escheat the property, under "traditional property law principles, plus historical practice and [Supreme Court] precedent," the property owner's failure to claim property from the private party holding it after only three years does not amount to an affirmative, voluntary surrender or relinquishment or disclaimer of all rights in the property for

a lengthy period of time sufficient to divest a property interest subject to the Takings Clause. *See id.*, at *4 & 8.

Texas law, the starting point for analyzing whether the circumstances under which the TUPA requires transfer of property to the Comptroller constitute abandonment sufficient to divest property owners of their rights, likewise dictates that they do not. *See Sharpe v. Turley*, 191 S.W.3d 362, 367 (Tex. App.—Dallas 2006, no pet.) ("abandonment" in the context of personal property means "[to] give up absolutely; to forsake entirely" and "includes an intent by the owner to leave the property free to be appropriated by another person") (citation omitted); *Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 879 (Tex. Civ. App.—Dallas 1962, writ ref'd n.r.e.) ("[A]bandonment requires an intent to abandon…."). TUPA requires no intent to abandon before requiring transfer of property to the Comptroller, which means it cannot declare property "abandoned" under Texas law.

The Magistrate mistakenly found Tyler unpersuasive on the basis that "[t]he statute in *Tyler* is entirely dissimilar to TUPA, and the *Tyler* Court did not disavow [*Texaco*]." R&R at 13-14 (ROA.205-06). Initially, the Supreme Court did not disavow *Texaco* in *Tyler*, because it distinguished the statute in *Texaco* from the one in *Tyler*. Further, the TUPA and the Minnesota statute in *Tyler* are exactly alike in two critical ways. First, they both transfer property to the State after only three years, too short a time to constitute "abandonment" that could divest the property owner of

ownership rights subject to the Takings Clause. Second, they both require transfer under conditions not meeting any state law, historical or Supreme Court standards for abandonment. For these reasons, unlike the Magistrate, this Court should find *Tyler* persuasive.

In contrast to the other cases he cited, discussed above, the Comptroller incorrectly relies upon two California cases for the exact opposite reason. The California cases potentially correctly applied *Texaco* because unlike the TUPA and the acts considered in the other cases, Cal. Code of Civ. P. § 1300(d) expressly provides that title to unclaimed property vests in the State of California, subject to the right of the owner to reclaim the escheated property.

Assuming after *Webb's* and *Tyler* that California can affect a "non-permanent escheat" of unclaimed property, a highly doubtful proposition, then the Ninth Circuit and the California Court of Appeals correctly held that California did not unconstitutionally "take" the interest generated by the unclaimed property from its prior owners because title to the property was vested in California at the time it earned the interest. *See Turnacliff*, 546 F.3d at 1119 (9th Cir. 2008); *Morris v. Chiang*, 163 Cal. App. 4th 753, 756 (Cal. App. 2008) ("Because title to plaintiff's property was legitimately vested in the state during the period in question, she was not entitled to the interest earned on it."). So, these cases also do not support the Comptroller's arguments, because the TUPA does not purport to cause a "non-

permanent escheat" of unclaimed property; rather, it is a purely custodial statue where title to unclaimed property always remains with the property owner.

Finally, while these and many of the other cases discussed above focus on the confiscation of interest as the "taking," the taking here occurred when the Comptroller took the property and the State used it for public purposes. *Knick*, 139 S. Ct. at 2170. Thus, just compensation may be measured by something other than the interest earned on the property by the State, likely the income it could have generated in Ambriz's hands. *See Brown v. Legal Foundation o0f Wash.*, 538 U.S. 216, 237 (2003) (holding that where property is taken temporarily, just compensation includes not only return of the property but also the net income it was capable of earning). To the extent that the State placed the property in investment vehicles available to the public, what the property could have generated in Ambriz's hands and what the State earned on it may be one and the same.

In summary, so long as a private citizen holds title to property, the State may not use or confiscate that property or the income it did or could have generated without the payment of just compensation. Because the TUPA never divested Ambriz of the ownership of the contents of his USAA account, $25.00, the Comptroller must pay him just compensation for using that property for public purposes.

## C.    Ambriz Suffered a Compensable Loss, Which the Comptroller Effectively Conceded Below

The Comptroller quoted the Supreme Court that "just compensation required by the Fifth Amendment is measured by the property owner's loss rather than the government's gain." Motion at 17 (ROA.105) (quoting *Brown*, 538 U.S. at 216). This citation of *Brown* could be understood as an argument that Ambriz could not have suffered an injury from the taking of his $25 because it would not have earned him any net interest.[9] That is incorrect. According to the Comptroller, the $25.00 was held in a "savings account," which, by definition, is an interest-bearing account, at USAA Federal Savings Bank. Complaint [Doc. 1] at 10 ¶ 24 (ROA.17).[10]

That argument also misses the point. Even if Ambriz's property had not been held in an interest-bearing account at the time it was taken into custody, that property has a time value, and "[t]he owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent

---

[9] In *Brown*, the Supreme Court held clients whose funds were placed in lawyers' IOLTA accounts but who did not receive the interest generated by those funds in the accounts (the interest was paid to legal aid organizations) had not suffered compensable losses under the Fifth Amendment because only client funds too small to generate net interest were placed in IOLTA accounts. 538 U.S. at 239-40.

[10] And Capitol One offers a no minimum, no-fee savings account with a 4.30% APY, indicating Ambriz's $25 is now and always has been capable of earning net interest. capitalone.com/bank/savings-accounts/online-perfromance-savings-account (last visited September 12, 2023). Non-savings account investments may have offered higher rates of return.

of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added." *Jacobs*, 290 U.S. at 17 (1933) (internal quotation marks and citation omitted).

Significantly, in the Ambriz Objections at 16-17 (ROA.231-32), Ambriz made this exact argument even though the R&R did not discuss it, because the Comptroller had argued that Ambriz has not suffered "a compensatory [sic] loss." Motion at 17-19 (ROA.105-07). The Comptroller did not, however, respond to Ambriz's argument as to why he has suffered a compensable loss in its Response to the Ambriz Objections. Response (Doc. 42) at 1-4 (ROA.261-64). Accordingly, the Comptroller has effectively conceded this point.

## **CONCLUSION**

Plaintiff-Appellant Rolando Ambriz requests the Court to:

(1)    reverse the dismissal with prejudice of his claim for prospective declaratory and injunctive relief under the Fifth Amendment;

(2)    hold: (a) he has sufficiently pleaded his Article III standing to bring such claim, (b) the Eleventh Amendment does not bar the claim, (c) he has sufficiently pleaded a claim for a taking under the Fifth Amendment as applied to the States by the Fourteenth Amendment, and (d) Tex. Prop. Code §§ 74.304(d) and 74.501(b) violate the Fifth Amendment as applied to the States by the Fourteenth

Amendment by prohibiting the Comptroller from paying just compensation for the State's public use of unclaimed property; and

(3)     grant him all such other relief, legal or equitable, to which he may be justly entitled.

*s/Roger L. Mandel*
ROGER L. MANDEL
JEEVES LAW GROUP, P.C.
Suite 135
2833 Crockett Street
Fort Worth, TX 76107
214-253-8300
rmandel@jeevesmandellawgroup.com
*Counsel for Plaintiff-Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2023, the foregoing brief was electronically filed with the Clerk of the Court of the U.S. Court of Appeals for the Fifth Circuit by using the CM/ECF system. Lead counsel for all the parties are registered CM/ECF users and will be served by the CM/ECF system.

*/s/Roger L. Mandel*
Roger L. Mandel

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.2 because, as calculated by Microsoft Word, it contains 12,944 words excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/Roger L. Mandel*
Roger L. Mandel

## **ADDENDUM OF STATUTES**

Tex. Prop. Code § 73.101

Inactive Account or Safe Deposit Box Presumed Abandoned

     a.     An account or safe deposit box is presumed abandoned if:

     (1)     Except as provided by Subsection (c), the account or safe deposit box has been inactive for at least five years as determined under Subsection (b);

…

     b.     For purposes of Subsection (a)(1):

     (1)     an account becomes inactive beginning on the date of the depositor's last transaction or correspondence concerning the account;

…

(c)     If the account is a checking or savings account or is a matured certificate of deposit, the account is presumed abandoned if the account has been inactive for at least three years as determined under Subsection (b)(1).

Tex. Prop. Code § 74.301

Delivery of Property to Comptroller

(a)     Except as provided by Subsection (c), each holder who on March 1 holds property to which this chapter applies shall deliver the property to the comptroller on or before the following July 1 accompanied by the report required to be filed under Section 74.101 (Property Report).

….

Tex. Prop. Code § 74.304

Responsibility After Delivery

(a)    If reported property is delivered to the comptroller, the state shall assume custody of the property and responsibility for its safekeeping.

…

(d)    The comptroller is not, in the absence of negligence or mishandling of the property, liable to the person who claims the property for damages incurred while the property or the proceeds from the sale of the property are in the comptroller's possession. But in any event the liability of the state is limited to the extent of the property delivered under this chapter and remaining in the possession of the comptroller at the time a suit is filed.

Tex. Prop. Code § 74.501

Claim Filed with Comptroller

…

(b)    If the comptroller determines that a claim is valid, the comptroller or the comptroller's authorized agent shall approve the claim. If the claim is for money and has been approved under this section, the comptroller shall pay the claim. If a claim is for personal property other than money and has been approved under this section, the comptroller shall deliver the property to the claimant unless the comptroller has sold the property. If the property has been sold under Section 74.401 (Sale of Property), the comptroller shall pay to the claimant the proceeds from the sale.

….

Tex. Prop. Code § 74.601

Unclaimed Money

…

(b)   The comptroller shall deposit to the credit of the general revenue fund:

   (1)   all funds, including marketable securities, delivered to the comptroller under this chapter or any other statute requiring the delivery of unclaimed property to the comptroller;

   (2)   all proceeds from the sale of any property, including marketable securities, under this chapter;

   (3)   all funds that have escheated to the state under Chapter 71 (Escheat of Property), except that funds relating to escheated real property shall be deposited according to Section 71.202 (Disposition of Real Property); and

   (4)   any income derived from investments of the unclaimed money.

…

(d)   Except as provided by Subsection (e), the comptroller shall from time to time invest the amount of unclaimed money in investments approved by law for the investment of state funds.

….

**<u>COPY OF UNPUBLISHED ORDER CITED IN BRIEF</u>**

Order of Dismissal (Doc. 27), Maron v. Patronis, Case No. 4:22cv255-RH-MAF (N.D. Fla. Sept. 5, 2023).

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

ALIEDA MARON, and
LAWRENCE MARON,

      Plaintiffs,

v.                          CASE NO.  4:22cv255-RH-MAF

JIMMY T. PATRONIS, JR.,

      Defendant.

_____/

## ORDER OF DISMISSAL

Like most states, the State of Florida takes custody of property that is
unclaimed for a sufficient period. Much of the unclaimed property is money, and
the State sells or otherwise converts the rest to money. The State retains some of
the money, sometimes accruing interest, but uses the remainder, mostly for
expenses incurred to operate the public schools.

Florida sets no deadline for an owner to reclaim property. But the owner can
recover only principal—not interest or other compensation for the State's retention
or use of the property prior to its return. This case presents a constitutional
challenge to the State's failure to pay interest or other compensation.

## I. Background: The Florida Disposition of Unclaimed Property Act

The Florida Disposition of Unclaimed Property Act ("the Act") is codified in Florida Statutes chapter 717. The Department of Financial Services administers the Act. *See* Fla. Stat. §§ 717.101(7), 717.123, 717.124. The Act defines a "holder" as a person or entity—for example, a bank—in possession of property belonging to another. *Id*. § 717.101(12). An "owner" is a person having a legal or equitable interest in property. *Id.* § 717.101(18). The Act provides that when intangible property is held in the ordinary course of a holder's business and the owner fails to claim it for more than five years, the property is presumed to be unclaimed, except as otherwise provided in the Act. Fla. Stat. § 717.102(1).

The Act addresses different types of property individually. *See id.* §§ 717.104 (traveler's checks), 717.1045 (gift certificates), 717.105 (checks, drafts, or other instruments), 717.106 (bank deposits), 717.107 (life insurance policies), 717.107–717.116 (others). The period after which property is presumed unclaimed varies by category of property, *see, e.g.*, *id.* § 717.104 (15 years for traveler's checks), and the Act has other provisions addressing when property is presumed to be unclaimed. *See, e.g.*, *id.* § 717.105(1) (stating that a check that has been outstanding for more than five years is presumed unclaimed unless the owner communicates with the financial institution about the check).

The holder of property that is presumed unclaimed must notify the Department and turn the property over. *See id.* § 717.117 & 717.119(1). The Department then must "make an effort to notify [the owner] in a cost-effective manner." *Id.* § 717.118(1). But the notification requirement does not apply to traveler's checks, money orders, or similar written instruments. *Id.* § 717.118(3).

Upon receipt, "the state assumes custody and responsibility for the safekeeping of the property." *Id.* § 717.1201(1). Property other than money is sold or otherwise converted to money. *See id.* § 717.122. Earnings on property other than money prior to its sale or conversion to money—stock dividends, for example—accrue to the benefit of the owner. *Id.* § 717.121. But on money in the hands of the Department—either as originally received or upon sale or conversion of other property—no interest or other income accrues to the benefit of the owner.

The Department deposits all funds it receives into the Unclaimed Property Trust Fund. *Id.* § 717.123. The Department retains in that fund an amount not exceeding $15 million—or, for the 2022–2023 fiscal year only, not exceeding $65 million—for "prompt payment of claims" and for payment of costs the Department incurs to administer the Act. *Id.* § 717.123(1). The Act does not indicate whether the Unclaimed Property Trust Fund bears interest.

The Department transfers the remainder of the funds—the Marons say the amount has exceeded $3 billion—to the interest-bearing State School Fund. *Id.* The

Florida Constitution allows use of that fund only to support and maintain free public schools. Fla. Const. art. IX, § 6.

A person claiming an interest in property delivered to the Department as unclaimed may file with the Department a claim on a prescribed form. Fla. Stat. § 717.124. If the Department approves the claim, the Department pays the claimant the amount of money the Department "actually received" or, for property that was sold or otherwise converted to money, the proceeds of the sale or conversion, together with income for the period *prior to* the sale or conversion. *Id.* § 717.124(4)(a). The Department does not compensate a claimant—through interest or otherwise—for money in the Unclaimed Property Trust Fund used to pay costs incurred to administer the Act, for money in the State School Fund used to support and maintain free public schools, or for money held in those funds, whether or not at interest.

## II. Background: This Lawsuit

The sole named plaintiff in the original complaint was Alieda Maron. But she has filed a consented motion for leave to file an amended complaint joining her husband Lawrence Maron as an additional named plaintiff. This order grants the motion.

The background is this. The Marons learned they were entitled to unclaimed property that had been turned over to the Department—specifically a premium

refund of some kind in the amount of $26.24. The Marons could have asked for and obtained from the Department a prompt payment of that amount, but instead they have left the Department with custody of and responsibility for the property and are pursuing this lawsuit. The Marons' grievance is that under the Act, the Department will pay them only the principal amount of $26.24, without interest or other compensation for the State's retention or use of the money either in the past or as each day passes going forward. They seek to represent a class of the many similarly situated owners of unclaimed property. The amended complaint explicitly demands only declaratory relief—not an injunction or award of damages—but also demands "such other and further relief" to which the Marons and the class may be entitled. Other relief perhaps could include an injunction to the extent otherwise permissible—and if it mattered, the complaint could be amended again to include a demand for such an injunction.

The only defendant is Florida's Chief Financial Officer Jimmy T. Patronis, Jr. in his official capacity.

In count one, the Marons assert a claim under 42 U.S.C. § 1983 and the Takings Clause of the United States Constitution's Fifth Amendment, made applicable to the states by the Fourteenth Amendment. In count two, the Marons again assert a takings claim, this time under Florida Constitution article X, section 6.

The defendant has moved to dismiss. He asserts the Marons lack standing, that their claims are barred by the Eleventh Amendment, that the court has discretion whether to entertain a claim for declaratory relief and should exercise the discretion to dismiss this action, and that the complaint fails to state a claim on which relief can be granted. Although directed to the original complaint, the parties have agreed that the motion should be treated as applicable to the amended complaint, without further briefing.

## III. Standing

To assess standing, one considers a plaintiff's colorable claims without deciding the merits. The Marons have standing because they assert a colorable—though, as it turns out, ultimately unfounded—claim that they have lost and are continuing to lose, every day, compensation they are entitled to under the federal and state constitutions. This is a colorable claim that, at least going forward, the defendant must pay the Marons money, and that they are entitled to declaratory relief to that effect. The loss is small, but a loss of money supports standing; no minimum amount is required. The loss is concrete and particularized, not conjectural or hypothetical; the loss is traceable to the challenged statute, which the defendant administers; and it is likely, indeed almost certain, that the injury would be redressed, at least going forward, by the declaration the Marons seek. This is

enough for standing. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

To be sure, the Marons' claim rests primarily on the assertion that the State has used their money, not just that the State has held their money in a non-interest-bearing account. The Department retains some of the unclaimed funds at issue in the Unclaimed Property Trust Fund, without receiving interest or other earnings on the funds, at least insofar as alleged in the amended complaint. But even if the Marons' claim is only that interest or other compensation is due on money the State uses, not on money the State merely holds, their claim to compensation is not impermissibly speculative. Money is fungible. One cannot know whether the Marons' $26.24 has resided all along among funds sitting idly or has been used. But the Marons have at least a colorable claim that under these circumstances— where the lion's share of the unclaimed funds are used by the State, not simply retained—all owners of a portion of the unclaimed funds are entitled to an appropriate share of the compensation the State owes based on its use of the funds.

The Marons have standing.

## IV. Eleventh Amendment

In *Edelman v. Jordan*, 415 U.S. 651 (1974), the Supreme Court held that the Eleventh Amendment bars a claim for *retrospective* relief under 42 U.S.C. § 1983 that would be payable from the state treasury, with exceptions not applicable here.

This precludes the Marons from obtaining a judgment requiring the defendant to pay backward-looking interest or other compensation, whether as the result of a money judgment, injunction, or declaration standing alone. That the unclaimed funds at issue are held in specific funds—the Unclaimed Property Trust Fund or the State School Fund—does not change this result. By this lawsuit, the Marons seek to recover interest or other compensation, not money held in the two funds, so the interest or other compensation would be payable from the state treasury. *Edelman* applies. The Eleventh Amendment bars any claim for retrospective relief.

The result is different for *prospective* relief. Under *Ex parte Young*, 209 U.S. 123 (1908), a § 1983 claim for prospective relief may go forward against an appropriate state official. The defendant administers the Florida Disposition of Unclaimed Property Act and is the appropriate defendant in an *Ex parte Young* action challenging the Act's constitutionality.

In count one, the Marons assert a § 1983 claim not just for retrospective relief but also for prospective relief—for a declaration that the defendant must pay interest or other compensation for use, and perhaps for retention, of unclaimed funds not only in the past but also *going forward*. The claim for prospective relief is a proper *Ex parte Young* claim squarely within the court's jurisdiction and not barred by the Eleventh Amendment. The Eleventh Amendment does not require dismissal of count one.

The same is not true for the state-law claim in count two. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984), the Supreme Court held that the Eleventh Amendment bars any claim based on state law against a state or against a state officer, even one for prospective relief, subject to exceptions not applicable here. The Eleventh Amendment requires dismissal of count two.

## V. Declaratory Relief

The defendant notes that a district court ordinarily has discretion whether to exercise jurisdiction over a claim for declaratory relief. *See, e.g.*, *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282–88 (1995). That makes little difference here, because if the demand for "other and further relief" could not properly be construed as a demand for injunctive relief, the complaint could easily be amended to include such a demand. Count one includes a claim for prospective relief that is within the court's jurisdiction and not barred by the Eleventh Amendment. And this is precisely the kind of circumstance in which a court should exercise its discretion to entertain a claim for declaratory relief. The dispute over the constitutional validity of the Florida Disposition of Unclaimed Property Act can and should be resolved in this action.

## VI. Merits

As the Marons acknowledge, Florida could have provided for escheat of unclaimed property—for termination of the owner's rights in the property, with

title passing to the State and with the owner having no right to get it back. A statute so providing would be constitutional. *See, e.g.*, *Texaco, Inc. v. Short*, 454 U.S. 516 (1982) (upholding a state statute terminating mineral rights not used or affirmatively renewed for 20 years); *Simon v. Weismann*, 301 F. App'x 107, 114 (3d Cir. 2008) (upholding a statute that, like the Florida statute now at issue, allowed an owner to recover the principal amount of unclaimed property, without interest or other compensation, and noting the state could have taken ownership of the property with no right to get it back). The theory is that property that is unclaimed for a sufficient period is effectively abandoned—and that a state may assume ownership of abandoned property without effecting a constitutional taking for which it must pay just compensation.

Instead of so providing, Florida has taken a more generous approach, giving an owner unlimited time to reassert the owner's rights in the property—unlimited time to recover the principal value of previously unclaimed property. If, as is settled, it would have been constitutional for the State to take the property entirely, without redress, it is difficult to discern why it should be unconstitutional for the State to give back to the owner the principal only, without interest or other compensation. *See Simon*, 301 F. App'x at 114. Indeed, Florida's seems a moderate, workable approach with benefits for both sides: Florida uses for a public

purpose some of the funds it could have taken outright while preserving the owner's ability to get back what the owner essentially abandoned.

The Marons assert, though, that the constitutional issue is controlled by who technically holds title, rather than by substantive considerations. This trivializes the constitutional interest protected by the Takings Clause. And if this was the law, Florida could continue to provide precisely the same substantive treatment of unclaimed funds as it does now—still allowing an owner to recover only principal, not interest or other compensation—simply by rewording the statute. A reworded statute could provide that title passes to the State upon delivery of unclaimed property to the Department of Financial Services and that the (now former) owner could petition for return of the property (or proceeds), with title passing back to the former owner simultaneously with return of the property (or proceeds). On the Marons' title-is-determinative theory, the owner would get no interest or other compensation while the state held title, precisely the same outcome as under current law.

The view that Florida's current approach is constitutional draws support not only from the Supreme Court's decision in *Texaco* and the Third Circuit's well-reasoned decision in *Simon* but also from *Turnacliff v. Westly*, 546 F.3d 1113, 1118–20 (9th Cir. 2008), *Dani v. Miller*, 374 P.3d 779, 793–94 (Okla. 2016), *Hooks v. Kennedy*, 961 So. 2d 425, 432 (La. Ct. App. 2007), and *Clark v.*

*Strayhorn*, 184 S.W.3d 906, 911–15 (Tex. App. Ct. 2006). In addition, a Florida circuit court has upheld the very Florida statute now at issue against a takings claim virtually identical to that asserted by the Marons. *See McKenzie v. Fla. Dep't of Fin. Servs.*, No. 04 CA 755 (Fla. Cir. Ct. Apr. 27, 2005) (included in this record at ECF No. 9-1).

The Seventh Circuit takes the opposite view, *see Goldberg v. Frerichs*, 912 F.3d 1009 (7th Cir. 2019); *Kolton v. Frerichs*, 869 F.3d 532 (7th Cir. 2017), but the Third and Ninth Circuit decisions, as well as the various state-court decisions, are more faithful to *Texaco* and have the better of it.

The Marons say interest follows principal, and that is ordinarily true. They say this means an owner of principal is entitled to any interest generated on the principal—and that a state's appropriation of the interest is an unconstitutional taking. For this they rely on *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998), and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980). But those decisions addressed a state's taking of interest on funds that were not abandoned—attorney trust accounts in *Phillips* and interpleaded funds in *Webb's*. Those decisions and the concept that interest follows principal say nothing about whether an owner who abandons property is entitled to interest or other compensation when the property is turned over to the state—especially when the property, while in the holder's possession, was sitting idly and generating no

interest or other earnings. The Marons were earning no interest on the premium

refund they effectively abandoned. Insisting that they now be paid interest would

give them an unwarranted windfall.

The Marons also cite *Tyler v. Hennepin County*, 143 S. Ct. 1369 (2023).

There a state seized a condominium for nonpayment of applicable taxes. A sale

netted a surplus above the unpaid amount. The Supreme Court held that the state's

refusal to remit the surplus to the owner violated the Takings Clause. But in

reaching this result, the Court explicitly rejected the assertion that by failing to pay

the tax, the owner abandoned the condominium. Far from supporting the Marons,

*Tyler* approvingly cited *Texaco* and reiterated that a state may treat as abandoned

and thus take without compensation property that an owner has not used or claimed

ownership of for a sufficient period. *Tyler* does not help the Marons.

The bottom line: it is constitutionally sufficient for Florida to return the

principal of the Marons' unclaimed property without interest or other

compensation.

## VII.  Conclusion

The Florida Disposition of Unclaimed Property Act requires the holder of

property that is unclaimed for a specified period—property that appears to be

abandoned—to turn the property over to the State. The Act gives the owner

unlimited time to recover the property or the proceeds of the property's sale or

other conversion to money. But the Act does not require the State to pay interest or other compensation for the period when the property was abandoned. This does not violate the United States Constitution Fifth Amendment Taking Clause. Count one of the amended complaint thus fails to state a claim on which relief can be granted.

The claim under the Florida Constitution in count two is barred by the Eleventh Amendment.

For these reasons,

IT IS ORDERED:

1. The motion, ECF No. 18, for leave to amend the complaint is granted. The amended complaint, ECF No. 18-1, is deemed properly filed, nunc pro tunc.

2. The motion to dismiss, ECF No. 10, is granted.

3. Count one of the amended complaint is dismissed with prejudice for failure to state a claim on which relief can be granted.

4. Count two is dismissed without prejudice based on Eleventh Amendment immunity.

5. The clerk must enter judgment and close the file.

SO ORDERED on September 5, 2023.

s/Robert L. Hinkle
United States District Judge